**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

TONY IBANEZ,

    Plaintiff,

v.

MIAMI-DADE FIRE RESCUE DEPARTMENT
and MIAMI-DADE COUNTY, FLORIDA,

    Defendants,
_____

CASE NO.:

*Plaintiff Demands a Trial by Jury*

## **COMPLAINT AND DEMAND FOR TRIAL BY JURY**

Plaintiff, Tony Ibanez (hereinafter referred to as "**Plaintiff**" and/or "**Ibanez**"), by and through his counsel, Derek Smith Law Group, PLLC, hereby complains of Defendants Miami-Dade Fire Rescue Department and Miami-Dade Fire Rescue Department (hereinafter collectively referred to as "**Defendants**", "**Defendant**" and/or "**MDFR**"), and alleges as follows:

### **INTRODUCTION**

1. This employment discrimination case is about an employer who subjected its Black-Cuban male employee, who identifies as a Black man and whose national origin is Cuban, to relentless harassment and discrimination.

2. Plaintiff, Tony Ibanez, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("**Title VII**"), 42 U.S.C. § 1981 ("**1981**"), and the Florida Civil Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**").

3. Mr. Ibanez seeks monetary relief to redress the Defendants unlawful employment practices in violation of Title VII, Section 1981, and the FCRA. Additionally, this action seeks to

1

redress Defendant's deprivation of Mr. Ibanez's personal dignity and his civil right to pursue equal employment opportunities.

4. At bottom, the Defendant is liable for subjecting Mr. Ibanez to a work environment rife with relentless race discrimination and national origin discrimination.

## PARTIES

5. At all material times, the Plaintiff, TONY IBANEZ, was/is a Black, Cuban male. Mr. Ibanez identifies as a Black man whose national origin is Cuban. Mr. Ibanez is a resident of the State of Florida, in Miami-Dade County.

6. At all times material, the Defendant, Miami-Dade Fire Rescue Department, was/is a governmental body existing by the virtues and laws of the State of Florida.

7. At all times material to this action, Mr. Ibanez was and continues to be employed by the Defendant, MDFR.

8. The exact number of employees at the above entity is unknown, but upon information and belief, the number of employees is well above the statutory minimum.

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1), and 42 U.S.C. § 1981.

10. Venue is proper in this Court under 28 U.S.C. §1391 because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Southern District of Florida. The Defendant MDFR is located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

11. The Plaintiff has complied with all statutory prerequisites to file this action.

12. On or about September 2, 2020, the Plaintiff dual-filed his charge for discrimination with the Equal Employment Opportunity Commission ("**EEOC**") and the Florida Commission on Human Relations ("**FCHR**") against the Defendant MDFR alleging the facts as set forth herein.

13. In accordance with and pursuant to the existing workshare agreement between the two agencies, an FCHR filing automatically operates as a dual EEOC filing.

14. On or about May 6, 2021, the EEOC issued the Plaintiff a Right to Sue Letter.

15. This action is being commenced within ninety (90) days of receipt of the EEOC Right to Sue Letter.

16. This action is being commenced more than (180) days since the inception of the Plaintiff's administrative action against the Defendant MDFR.

## STATEMENT OF MATERIAL FACTS

17. On or about March 10, 2008, Mr. Ibanez was hired by Defendant MDFR as a Firefighter/Paramedic.

18. Throughout Mr. Ibanez's employment with MDFR, his performance was always exemplary, and he had proven himself to be an exceptional and professional employee. By way of example, Mr. Ibanez received the "2019 Firefighter of the Year Award" for his dedication to providing outstanding fire and emergency services.

19. In or around December 2016, Mr. Ibanez began to experience hateful and discriminatory remarks in relation to his race and national origin on a continuing basis, while at work, by NICKI LATTIMORE (hereinafter referred to as "**LATTIMORE**"), a Captain and employee of Defendant MDFR. At all times relevant to this action, Lattimore held direct

3

supervisory authority over the Plaintiff, controlling the various terms and conditions of his employment.

20. On numerous occasions, Lattimore referred to Mr. Ibanez and other Hispanic employees of MDFR as "**SPICS**". During discussions of the fraud crime rates in Miami-Dade County, Lattimore would also use phrases such as "**ALL YOU SPICS ARE LIKE THAT**".

21. On at least three (3) separate occasions, Lattimore physically assaulted Mr. Ibanez by punching him in the shoulder and arm while he was driving the fire truck on the way to an active call. Lattimore struck Mr. Ibanez several times in the head, causing Mr. Ibanez significant pain and emotional distress.

22. On one occasion, Mr. Ibanez fell ill while working and told his co-workers about the symptoms he was experiencing. In response, Lattimore told Mr. Ibanez to "**MAN UP**" and to "**STOP BEING A PUSSY**." Lattimore taunted Mr. Ibanez by stating "**YOU AIN'T GOING HOME, I AIN'T LETTING YOU**." Despite Lattimore making these comments in the presence of a former Fire Battalion Chief WILBUR HARBIN (hereinafter referred to as "**HARBIN**"), no corrective or preventative action was taken in response to the hostile and disrespectful comments made by Mr. Ibanez's supervisor.

23. In or around January 2017, Mr. Ibanez complained to ABEL FERNANDEZ (hereinafter referred to as "**FERNANDEZ**"), Battalion Chief and Mr. Ibanez's direct supervisor, about the discriminatory conducts and comments he was experiencing at the hands of Lattimore. At all times relevant to this action, Fernandez held direct supervisory authority over the Plaintiff, controlling the various terms and conditions of his employment.

24. After Mr. Ibanez's complaint to his Battalion Chief, Mr. Ibanez also complained to Union Representative WILLFREDO FLEITES (hereinafter referred to as "**FLEITES**") and the

Battalion 14 Union Representative (first and last name unknown), concerning the discriminatory conduct and physical assaults by Lattimore.

25. In response to Mr. Ibanez's complaints, Fleites failed to take any action or offer any assistance.

26. On or around June 13, 2017, Personnel Specialist TONYA T. WILSON (hereinafter referred to as "**WILSON**") sent an email address to Mr. Ibanez and Lattimore. The email stated that a meeting would take place on June 16, 2017, in relation to Mr. Ibanez's complaints of discrimination.

27. At this meeting, Mr. Ibanez, Division Chief JOHN KRUMENACKER (hereinafter referred to as "**KRUMENACKER**"), Fire Chief FELIPE OSABA (hereinafter referred to as "**OSABA**"), Union Officer BRIAN LYNCH (hereinafter referred to as "**LYNCH**"), Wilson, and Lattimore were all present.

28. Throughout this meeting, Mr. Ibanez described his hostile experiences, including the physical attacks and discriminatory conduct by Lattimore, and expressed his concern for his own safety and well-being.

29. During the meeting, Osaba remarked to Mr. Ibanez "Tony, what happens if you go to another station and have a problem? You are going to look like a troublemaker." As a result of Osaba's comment, Mr. Ibanez felt threatened and targeted.

30. At the meeting, Mr. Ibanez was informed that a series of interviews were conducted during the investigation of his complaints of discrimination.

31. Mr. Ibanez requested to hear the audio of the taped interviews, to which Lynch responded "The tapes are lost, and we would have to re-do the interviews" to give Mr. Ibanez the audio recordings.

32. The meeting ultimately concluded with Defendant MDFR callously informing Mr. Ibanez that he and his attacker Lattimore, must "get along" moving forward, or Mr. Ibanez would be forced to relinquish his preferred bid, which would determine his station and scheduling assignment.

33. On or about June 19, 2017, Mr. Ibanez was forced to relinquish his bid.

34. On or about July 7, 2017, Mr. Ibanez sent a follow-up email to Fernandez, Krumenacker, and Human Resources Director SHARON SMITH (hereinafter referred to as "**SMITH**") regarding the outcome of the meeting and his concerns. Mr. Ibanez did not receive a formal response or update.

35. In or about October 2017, Mr. Ibanez began to work for Battalion 5 Rescue 26 (hereinafter referred to as "**Station 26**").

36. As a result of the move, Mr. Ibanez's new supervisor became JOSE MENDEZ (hereinater referred to as "**MENDEZ**"), and Lieutenant DESSIRE LINDAUER (hereinafter referred to as "**LINDAUER**") was the Officer in Charge ("**OFC**").

37. On or about October 11, 2018, Lindauer invited the crew of Station 26 to come eat dinner at the dining table. It was common practice for Lindauer to ring the bells at Station 26 to announce dinner time.

38. At dinner, Mr. Ibanez noticed that Lindauer had intentionally excluded a Black firefighter from dinner. Mr. Ibanez brought the issue to Lindauer's attention, to which she responded, "**I DON'T CARE**".

39. Mr. Ibanez was shocked and appalled by Lindauer's discriminatory conduct and refused to take part. Mr. Ibanez got up from the dinner table and promptly invited the Black firefighter to join the crew at the dinner table.

40. When the Black firefighter arrived at the dinner table, he complained "**YOU DIDN'T GET ME BECAUSE I AM BLACK. Y'ALL ARE RACIST**." Lindauer then began to mock Mr. Ibanez and the Black firefighter by asking "**WHY DO NIGGERS SMELL LIKE FISH?**"

41. This comment was not an isolated incident. On multiple occasions, Lindauer made comments targeting African Americans by stating that predominantly Black neighborhoods "**LOOK LIKE SHIT**." Lindauer also made stereotypical and demeaning comments such as "**BLACK PEOPLE SUCK THE GOVERNMENT DRY**", "**BLACK PEOPLE RAISE THEIR KIDS LIKE ANIMALS**", and "**BLACK PEOPLE ARE LAZY**."

42. Throughout his time at Station 26, Mr. Ibanez made complaints to Lieutenant JOSE MENENDEZ (hereinafter referred to as "**MENENDEZ**"), Chief DANIEL BOLLINE (hereinafter referred to as "**BOLLINE**"), and the Union President, concerning the discriminatory conduct by Lindauer.

43. Neither Defendant MDFR, nor any of its agents, took any action to correct or prevent the discriminatory conduct experienced by Mr. Ibanez. Mr. Ibanez had no choice but to continue working under the abusive conditions created by Lindauer.

44. During Mr. Ibanez's employment at Station 26, Lindauer made work unbearable for Mr. Ibanez. Lindauer regularly berated Mr. Ibanez and was needlessly critical towards him, in front of other firefighters.

45. On or about March 13, 2020, Lieutenant DARWEN VALLAVIENCIO (hereinafter referred to as "**VALLAVIENCIO**", pulled Mr. Ibanez to the side and advised him that he wanted to conduct a meeting between him and Lindauer.

46. During this meeting, Vallaviencio advised Mr. Ibanez that all communications concerning any work duties or issues must go through him directly. Lindauer demanded that Mr. Ibanez only speak to Vallaviencio moving forward, and that he would be Mr. Ibanez's direct supervisor moving forward. She then stated, "**I DO NOT WANT TO BE ALONE WITH YOU**."

47. On or about April 27, 2020, Lindauer advised the crew, including Mr. Ibanez, to go outside for a drill. During the practice drill runs, Mr. Ibanez's foot got caught in between the hose, and another firefighter simultaneously pulled that same fire hose, which threw Mr. Ibanez to ground. Mr. Ibanez landed directly on the hard concrete, injuring both his head and right shoulder. Mr. Ibanez immediately began to hear ringing in his ears. Despite these serious injuries, Mr. Ibanez was forced to finish his drills.

48. Shortly after his accident, Mr. Ibanez had to travel to numerous stations to fuel the truck and meet with the Battalion. During this trip, Mr. Ibanez's ears began to ring increasingly louder. The ringing, combined with Mr. Ibanez's severe pain, caused him to begin vomiting.

49. Mr. Ibanez was later transported to the emergency room, where the treating physician concluded that Mr. Ibanez had suffered a head injury resulting in a concussion, loss of consciousness, and swelling on the front right side of his temple.

50. Mr. Ibanez's Primary Care Physician later conducted additional tests, which showed that Mr. Ibanez suffered from Periventricular Leukomalacia, also known as PVL. A spinal MRI report also concluded bulging discs to C3-4. C4-5, and C5-6.

51. Lindauer failed to take appropriate action when Mr. Ibanez was injured, only further exacerbating Mr. Ibanez's pain and suffering. This incident was representative of Lindauer's disdain and disrespect towards Black firefighters. Lindauer exhibited a pattern of discriminatory conduct towards Mr. Ibanez and other Black firefighters.

52. The aforementioned allegations are just some of the examples of the discrimination that Mr. Ibanez suffered at the hands of the Defendant and are not an exhaustive list of Mr. Ibanez's experiences of discrimination and harassment while employed with Defendant.

53. Mr. Ibanez believes he has been discriminated against in violation of Title VII, Section 1981, and the FCRA.

54. Additionally, Mr. Ibanez further claims a continuous practice of discrimination and continuing violations and makes all claims herein under the continuing violations doctrine. The Defendant has exhibited a pattern and practice of unlawful discriminatory conduct.

55. As a result of the Defendant's conduct and actions, Mr. Ibanez has suffered and will continue to suffer loss of income, loss of salary, bonuses, benefits, and other compensation which such employment entails. Mr. Ibanez has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

56. Further, as a result of the Defendant's unlawful employment practices, Mr. Ibanez felt extremely humiliated, degraded, victimized, embarrassed and has suffered severe emotional and physical distress. The Defendant's conduct has also caused Mr. Ibanez to suffer from increased stress, unbearable anxiety, and difficulty sleeping.

57. As Defendant's conduct has been malicious, willful, extreme, and outrageous, and with full knowledge of the law, Mr. Ibanez seeks punitive damages, jointly and/or severally against the Defendant. Mr. Ibanez has presented factual allegations that would permit any reasonable jury to award damages.

58. At bottom, the Defendant is liable for their reckless disregard for Mr. Ibanez's personal dignity and his civil right to pursue equal employment opportunity.

59. Mr. Ibanez has suffered damages as a result of the Defendant's unlawful employment practices.

**COUNT ONE**
*Cause of Action for Discrimination Under Title VII for Disparate Treatment Based*

60. The Plaintiff reincorporates the allegations in the previous paragraphs 17-59.

61. The Defendant MDFR is prohibited under Title VII from discriminating against the Plaintiff because of his race and/or national origin with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

> Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:
>
> "(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

62. The Defendant MDFR engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against the Plaintiff because of his race and/or national origin.

63. At all times relevant, the Defendant MDFR, by and through its employees, intended to unlawfully discriminate against the Plaintiff Mr. Ibanez in the terms and conditions of his employment because of his race and/or national origin, and the Defendant MDFR did unlawfully discriminate against the Plaintiff Mr. Ibanez in the terms and privileges of his employment because of his race and/or national origin, in violation of the Title VII.

64. The discriminatory actions of the Defendant MDFR against the Plaintiff, as described and set forth above, constitute an adverse employment action for purposes of Title VII.

In subjecting the Plaintiff to adverse employment action, the Defendant intentionally discriminated against the Plaintiff with respect to the compensation, terms, conditions, or privileges of his employment.

65. The Defendant MDFR violated Title VII by unlawfully discriminating against the Plaintiff based his race and/or national origin, of which the Defendant was fully aware.

66. As a direct and proximate result of the Defendant MDFR's intentional discriminatory conduct in violation of Title VII, the Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. The Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. The Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

67. The Defendant MDFR's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

68. The conduct of the Defendant MDFR and/or its agents deprived the Plaintiff of his statutory rights guaranteed under Title VII.

69. The Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT TWO
*Cause of Action for Discrimination Under Title VII for Hostile Work Environment*

70. The Plaintiff reincorporates the allegations in the previous paragraphs 17-59.

71. The Defendant MDFR is prohibited under the Title VII from discriminating against the Plaintiff because of his race and/or national origin with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:

"(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

72. The Defendant MDFR engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by subjecting the Plaintiff to a hostile work environment based solely on his race and/or national origin.

73. The Plaintiff Mr. Ibanez was subject to unwelcome, offensive, and harassing discriminatory conduct during his employment with the Defendant MDFR, and this conduct was directed to and perpetuated upon the Plaintiff because of his race and/or national origin.

74. The Defendant's conduct was severe or pervasive enough to make a reasonable person of the same protected class believe that the conditions of employment were altered, and that the environment was intimidating, hostile, or abusive.

75. The harassing conduct was directly connected to the Plaintiff's race and/or national origin.

76. The Defendant's employees regularly harassed the Plaintiff because of his race, national origin, and his complaints of discrimination.

77. The Defendant's employees regularly made discriminatory comments about the Plaintiff on account of his race and national origin.

78. As a result of the hostile work environment, the Plaintiff suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

79. The Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for the Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

80. As a direct and proximate result of the Defendant MDFR's intentional discriminatory conduct in violation of Title VII, the Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. The Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. The Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

81. The Defendant MDFR's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

82. The conduct of the Defendant MDFR and/or its agents deprived the Plaintiff of his statutory rights guaranteed under Title VII.

83. The Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT THREE**
*Race Discrimination (Discrete Act)*
*in Violation of* § **1981**

84. The Plaintiff reincorporates the allegations in the previous paragraphs 17-59.

85. This is an action for discrimination and harassment because of the Plaintiff's race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

(a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. §1981.

86. The Plaintiff, as a member of the African American race, was discriminated against by the Defendant because of his race, as provided under 42 U.S.C. §1981 and has suffered damages as set forth herein.

87. The Defendant constantly enforced a purposefully discriminatory pattern and practice of denying African American employees of the equal rights described therein, in further violation of 42 U.S.C. §1981.

88. The Plaintiff is an African American man and is protected under Section 1981.

89. At all times relevant, the Plaintiff was treated differently because of his race.

90. As a result of the Defendant's discrimination in violation of Section 1981, the Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of the Plaintiff's contractual relationship, which provided substantial compensation and benefits, thereby entitling her to injunctive and equitable monetary relief; and having suffered such anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of the Defendants' actions, thereby entitling the Plaintiff to compensatory damages.

91. As alleged above, the Defendant acted with malice or reckless indifference to the rights of the Plaintiff and copious other individuals named herein, thereby entitling the Plaintiff to an award of punitive damages.

92. The Defendant committed the violations mentioned above and the Plaintiff has suffered numerous damages as a result.

93. The Plaintiff makes a claim against the Defendant under all of the applicable paragraphs of 42 U.S.C. §1981.

94. The Plaintiff claims the Defendant unlawfully discriminated against the Plaintiff in violation of 42 U.S.C. §1981.

**COUNT FOUR**
*Race Discrimination (Hostile Work Environment)*
*in Violation of § 1981*

95. The Plaintiff reincorporates the allegations in the previous paragraphs 17-59.

96. This is an action for discrimination and harassment because of the Plaintiff's race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

> (a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make

and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. (b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

97. Here, the Defendant's conduct occurred because of the Plaintiff's legally protected characteristic; and was severe or pervasive enough to make a reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile or abusive.

98. The harassing conduct was directly connected to the Plaintiff's race.

99. The Defendant's employees regularly harassed the Plaintiff because of his race and his complaints of discrimination.

100. The Defendants' employees regularly made discriminatory comments about the Plaintiff on account of his race.

101. The Defendant's discriminatory conduct was not welcomed by the Plaintiff.

102. As a result of the hostile work environment, the Plaintiff suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

103. The Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for the Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

104. As a result of the Defendant's violations of § 1981, the Plaintiff has suffered damages, including, but not limited to: past and future lost wages, mental pain, and suffering; humiliation; emotional distress; diminishment of career opportunities; harm to business reputation; loss of self-esteem; disruption to his family life; and other harm, pain, and suffering, both tangible and intangible.

## COUNT FIVE
*Race Discrimination (Discrete Act)*
*in Violation of the FCRA §760.10(1)(a)*

105. Plaintiff reincorporates the allegations in the previous paragraphs 17-59.

106. Section 760.10(1)(a), Florida Statutes prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race and/or national origin.

107. Plaintiff is a Black/African American man, of Cuban national origin, and is protected under both Title VII and Section 1981.

108. Defendant subjected Plaintiff to the discriminatory treatment described above, including but not limited to discriminatory comments, harassment, and physical assault on the basis of his race and/or national origin.

109. At all times relevant, Plaintiff was treated differently and less favorably because of his race and/or national origin.

110. Defendant is strictly and/or vicariously liable for subjecting Plaintiff to a race-based and national origin-based hostile work environment.

111. Defendant MDFR violated Section 760.10(1)(a), Florida Statutes, by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment because of his race and/or national origin.

112. As an actual and proximate result of Defendant MDFR's unlawful employment practices in violation of Section 760.10(1)(a), Florida Statutes, Plaintiff has suffered damages.

### COUNT SIX
*Race Discrimination (Hostile Work Environment)*
*in Violation of the FCRA §760.10(1)(a)*

113. Plaintiff reincorporates the allegations in the previous paragraphs 17-59.

114. Florida courts recognize hostile work environment claims based on race and national origin under the FCRA.

115. The Plaintiff Mr. Ibanez was subject to unwelcome, offensive, and harassing discriminatory conduct during his employment with the Defendant MDFR, and this conduct was directed to and perpetuated upon the Plaintiff because of his race and/or national origin.

116. The Defendant's conduct was severe or pervasive enough to make a reasonable person of the same protected class believe that the conditions of employment were altered, and that the environment was intimidating, hostile, or abusive.

117. The harassing conduct was directly connected to the Plaintiff's race and/or national origin.

118. The Defendant's employees regularly harassed the Plaintiff because of his race, national origin, and his complaints of discrimination.

119. The Defendant's employees regularly made discriminatory comments about the Plaintiff on account of his race and national origin.

120. As a result of the hostile work environment, the Plaintiff suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

121. The Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for the Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

122. Defendant is strictly and/or vicariously liable for subjecting Plaintiff to a hostile work environment, based on the Plaintiff's race and/or national origin.

123. As a direct and proximate result of Defendant MDFR's unlawful employment practices in violation of Section 760.10(1)(a), Florida Statutes, Plaintiff has suffered damages.

## DEMAND FOR JURY TRIAL

The Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests this Court enter judgment against the Defendant for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of Title VII, 42 U.S.C. §1981, and the FCRA.

Dated: Miami, Florida
       August 04, 2021

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

By: /s/ Tiffani-Ruth I. Brooks, Esq.
Tiffani-Ruth I. Brooks, Esq.
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Tiffani@dereksmithlaw.com