IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

TONY IBANEZ,

    Plaintiff,

        v.

MIAMI-DADE COUNTY, FLORIDA, and
YVETTE D. LINDAUER,

    Defendants.

*CASE NO.: 1:21-cv-22850-KMW*

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

    Plaintiff Tony Ibanez, (hereinafter "**Plaintiff**" and/or "**Mr. Ibanez**"), by and through his attorneys, Derek Smith Law Group, PLLC, submits this Memorandum in Opposition to Defendants Miami-Dade County and Yvette D. Lindauer's (collectively referred to herein as "**Defendants**") Motion for Summary Judgement pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L. R. 7.1, respectfully requests this Court deny Defendants' Motion for Summary Judgement.

## PRELIMINARY STATEMENT

    On August 4, 2021, Mr. Ibanez commenced the herein referenced action against his former employer and supervisor, Defendants Miami-Dade County and Yvette D. Lindauer [D.E. 1]. On February 7, 2022, Plaintiff subsequently filed an Amended Complaint bringing forth violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the Florida Civil Rights Act of 1992, Fla. Stat. §§ 760 *et seq*. ("FCRA"), 42 U.S.C. § 1981 ("Section 1981"), the Rehabilitation Act of 1973, 29 U.S.C. § 794 § 504(d) ("Rehabilitation Act"), and Fla. Stat. §§ 440.205 *et seq*. [D.E. 22].

## STATEMENT OF UNDISPUTED FACTS

Plaintiff hereby incorporates by reference Plaintiff's Counter to Defendants' Statement of Material Facts pursuant to Fed. R. Civ. Pr. 56(1). *See ECF No. 60.*[1]

## SUMMARY JUDGEMENT STANDARD

Defendants Joint Motion for Summary Judgment must be denied, despite assertion to the contrary, as there remains numerous material issues of fact with respect to Plaintiff Ibanez's underlying claims. As set forth at length herein, the arguments raised by Defendant Miami Dade County (hereinafter "**Defendant**" and/or "**MDC**") are devoid of merit.

At its foundational core, summary judgement is only warranted where there remain no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322. "A fact is material if it may affect the outcome of the suit under the governing law." *Muniz v. GCA Services Group, Inc.* 2006 WL 2130735, *3 (M.D. Fl, July 28, 2006). A controverted material fact is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Id.* at 242-243.

In evaluating a motion for summary judgement "[t]he burden, furthermore, is on the movant to demonstrate conclusively that the nonmoving party cannot prevail. If the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper." *Jackson-Jester v. Aziz,* 48 So.3d 88, 90 (2010) (*citing Gomes v. Stevens*, 548 So.2d 1163, 1164 (Fla. 2d DCA 1989)). Where conflict arises as to the allegations or evidence, it is the obligation of the Court to presume as true all evidence presented by the non-moving party "and all reasonable inferences must be drawn the in the non-moving party's favor." *Muniz*, *3.

---

[1] All Exhibits are contained within Plaintiffs' Counter Statement of Undisputed Facts.

Ultimately, it is well settled that the role of the Court in evaluating a Motion for Summary Judgement is issue finding rather than issue determination. *Sillman v. Twentieth Century-Fox Film Corp.*, 3 N.Y.2d 395, 404 (1957). The weighing of evidence and the assessment of credibility are matters that lie exclusively within the province of the finder of fact, not the Court. *See generally Ward v. Most Health Services, Inc.*, 2008 WL 3411844 (E.D. Pa. 2008). "When the defendant's intent has been called into question, the matter is within the sole providence of the factfinder." *Jalil v. Avdel Corporation*, 873 F.2d 701, 707 (3d Cir. 1988). In the employment discrimination context, it is well recognized that summary judgment is to be used "sparingly." *Zielinski v. Pulte Grp., Inc.*, No. CIV.A. 10-6761, 2011 WL 2937427, at *1 (E.D. Pa. July 21, 2011). It is the Defendants in this case, as the moving party, that bear the burden of demonstrating no material fact issue exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). As evidenced below, this is a burden the Defendant MDC cannot meet.[2]

## LEGAL ARGUMENT

### A. Plaintiff Ibanez's Claim for Retaliation Pursuant to Title VII were Filed Timely

The Defendant MDC's primary contention as it relates to Plaintiff's Title VII cause of action for retaliation turns entirely on whether Plaintiff's claim was timely filed. As properly noted by the Defense, it is an express requirement that the Plaintiff need exhaust all applicable administrative prerequisites in the course of bring a claim pursuant to Title VII. *Rance v. D.R. Horton, Inc.*, No. 07-80402-CIV, 2007 WL 9754866, at *2 (S.D. Fla. Sept. 28, 2007). In doing such, Plaintiff must not only file his charge within 300 days of the asserted discrimination and/or retaliatory conduct but must further bring the action in a timely manner once a right to sue is received. *Id.*; *see also 42 U.S.C. § 2000E-5(e)(1).

---

[2] Upon review of the applicable case law, Plaintiff Ibanez acknowledges and withdraws Counts III and VI (Claims arising pursuant to Section 1981) and Counts II and V (Claims arising pursuant to the FCRA). As such, no claims remain as against Defendant Lindauer and no such arguments will be made as to her individual liability.

To that end, an amended pleading is read to relate back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading" *See* Fed. Rule. of Civ. Pro. 15(c). This is a generally "permissive" standard so long as the amended complaint in question "refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint, there will be no bar to amendment. *Hajiani v. AirTran Airways Inc.*, 2017 WL 2180675, @ *2 (N.D. Georgia, May 17, 2017) (internal quotation omitted).

Ultimately, an amended pleading is deemed to relate back when the conduct asserted arose from the same "conduct, transaction, or occurrence" as previously set forth. *Marker v. Miami-Dade County Fla.*, 485 F. Supp. 2d 1349, 1355 (S.D. Fla. 2007). The fact that Plaintiff's amended cause of action arose outside of the ninety-day deadline as established in the right to sue is not dispositive into itself. Rather, the question remains (1) was the original pleading filed timely and (2) does the amended pleading relate back? *See Walker v. Fulton County School Dist.*, 624 Fed. Appx. 683, 686-687 (11th Cir. 2016).

The facts as presented in *Marker* are vastly in contradiction with the facts and circumstances of the herein case. In *Marker,* the Court's decision to deny Plaintiff's amended claim under the ADA arose from the fact that there was no conceivable "reason why allegation in a complaint for wrongful death should have put the County on notice of an ADA claim for discrimination." *See Market,* at 1355. The denial to permit the amended complaint in *Hajiani* similar was based on the Plaintiff's failure to plead a single operative fact in the original complaint which would have put the defense on notice of the potential amended action.

As an initial point, the Defense was put expressly on notice of Plaintiff's intent to file his claims for retaliation as noted in the Civil Cover Sheet filed in connection with Plaintiff's Original Pleading. *See D.E. 1-1.* Pursuant to the information requested under "VII. Cause of Action," Plaintiff provided "Discrimination *and retaliation.*" *Id.*   (Emphasis added).

Unlike the facts as set for in the preceding cases, and in particular, the facts as set forth in *Walker*, Plaintiff Ibanez's original complaint set forth details pertaining to Plaintiff's protected activity including but not limited to Plaintiff's January 2017 complaint regarding the asserted on-going discrimination (D.E. 1, Par. 23), Plaintiff's complaint to his union representative at or around the same time (D.E. 1, Par. 24), Plaintiff's communication and meeting(s) with human resources regarding the discrimination (D.E. 1, Par. 26-34), and Plaintiff's complaints regarding Lieutenant Lindauer to Lieutenant Jose and Chief Boline (D.E. 1, Par. 42). Plaintiff similarly detailed the adverse actions to which he was subjected as a result including relinquishing his bid (D.E. 1, Par. 33), escalating harassment by Lieutenant Lindauer (D.E. 1, Par. 38, 40-41), and failing to timely and properly treat Plaintiff's work-related injury (D.E. 1, Par. 47-51).

Based on the foregoing, the Court can reasonably conclude that Plaintiff's claim of retaliation in violation of Title VII was in fact timely as it arose from the conduct, transaction and/or occurrences expressly outlined in his original pleading.

### B. Defendant MDC is Liable for Subjected Plaintiff to an Unlawful Hostile Work Environment

Defendant MDC is liable for subjecting Mr. Ibanez to a long standing and invasive hostile work environment.

#### i. Defendant's Conduct Triggered the Continuing Violations Doctrine

It is well settled law that a Plaintiff cannot recover for that which occurred before the proper filing period. As noted by the Defense in *Jones*, the Supreme Court has "instructed that a

hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Jones v. Allstate Insurance Company,* 707 Fed. Appx. 641, 647 (11th Cir. 2017) (Quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) (Internal Quotation Omitted)).

Defendant Lindauer's conduct unto itself was consistent and frequent throughout the time Plaintiff was assigned to her Station and subject to her supervision. Contrary to the assertions of the defense, Lieutenant Lindauer's acts of hostility directed at Mr. Ibanez were more than the cited use of racial slurs on two occasions.

While his relationship with Lieutenant Lindauer seemingly began on the right foot, it felt to Plaintiff that their relationship took a downward turn after she learned that Plaintiff is part black during his first bid period. [D.E. 37, Par. 26.] She would make racially charged "jokes" and comments despite Plaintiff directly advising her that these jokes were inappropriate. *Id.* Despite his repeated protest, she persisted undeterred. *Id.* Lieutenant Lindauer even went so far as to say she did not like working with African American firefighters. *Id. at Par. 25*.

Plaintiff Ibanez testified recalling her making comments such as "[A]ll black people suck the government dry," "[B]lack people raise their kids like animals," and that black people, including firefighters under her command, "smell like fish." *Id.*. Plaintiff provided in detail an even where he was present for Ms. Lindauer saying that, in reference to his fellow fire fighter, "this nigger smells like fish." *Id*. Plaintiff recalled a second incident wherein Lieutenant Lindauer was discussing a patient with Mr. Ibanez and stated without hesitation, "This nigger is full of shit." *Id. at Par. 21*.

6

She isolated her team, making clear lines as to seating assignments and even so much as excluding a fellow black fire fighters from dinner on at least one occasion. *Id. Par. 26*. Despite her insistence that her firefighters eat together, when Plaintiff notified Lieutenant Lindauer about the isolated firefighter, she responded, "I don't care about him" and continued eating. *Id*. Lieutenant Lindauer herself corroborated this incident occurring, stating that when Mr. Ibanez and the second firefighter returned together, the fire fighter stated outright, "You guys left me out because I'm black." *Id.*

Mr. Ibanez was routinely the target of Lieutenant Lindauer's racist ire in the form of baseless meetings designed to make him appear insubordinate or disrespectful. [*Ex. A, Ibanez, at 64:3-15*]. By means of example, Plaintiff was required to attend a meeting with Chief Boline, Captain Parr, and Lieutenant Lindauer regarding computer use and access. [*Ex. A, Ibanez, at 62:13-63:9*].

As Plaintiff recalls, this meeting took a threatening turn when the discussion shifted to table seating assignments during dinner. [*Ex. A, Ibanez, at 65:23-66:20*]. Chief Boline, as Plaintiff recalled, made comments regarding how he would allow his team to grab Plaintiff by the neck to obtain what chair they preferred in the station. *Id.*

In sum, the record reflects that Lieutenant Lindauer cultivated a racially hostile environment on a frequent and consistent basis throughout the entirety of Plaintiff's tenure under her supervision.

    ii.    **Defendant's Conduct was Severe and Pervasive**

To be actionable, a hostile work environment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). As is generally understood, to prevail on a claim

under the theory of hostile work environment, a plaintiff must establish that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that are sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Walls v. Lowe's Home Centers, LLC*, 789 F. App'x 852, 853 (11th Cir. 2019).

Plaintiff can unequivocally prove he (1) suffered intentional discrimination because of his race; (2) the discrimination was severe and/or pervasive; (3) it detrimentally affected him; (4) it would detrimentally affect a reasonable person in like circumstances; and (5) *respondeat superior* liability. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir.1999). Further, in evaluating the severe and/or pervasive nature of Plaintiff's claim, the Court must apply both a subjective and objective standard. *Id*. "The employee must establish not only that he subjectively perceived the environment as hostile, but that a reasonable person would perceive the environment to be hostile and abusive." *Barrow v. Georgia Pacific Corp*., 144 Fed.Appx. 54. 56 (2005)(*Citing Watkins v. Bowden,* 105 F.3d 1344, 1355–56 (11th Cir.1997).

Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 277 (4th Cir. 2015) (*quoting Oncale v. Sundowner Offshore Servs*., Inc., 523 U.S. 75, 81, (1998)). That determination is made "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

As outlined above, Lieutenant Lindauer's conduct beginning at the start of Plaintiff's initially bid period under her supervision and continuing through the end of his time at her

station was replete with racially charged conduct ranging from discrepancies in eating to open, unabashed use of the word "nigger." [D.E. 37, Par. 21-26.]. Furthermore, and despite the futility in reporting the unlawful conduct of Lieutenant Lindauer and despite his negative treatment relating to his complaints in 2017 pertaining to Lieutenant Lattimore, Plaintiff complained. And again, nothing changed.

Despite the complaints filed by both Plaintiff and his colleague, Bryan Ruiz, the efforts of the Defendant to "investigate" proved to be half-hearted at best, causing understandable apprehension in bringing forth future claims.

Plaintiff testified that, in terms of the outcome, he was instructed by Chief Krumenacker to either "get along with Nicky Lattimore or let my bid go." *Id. at Par. 10-12*. He further recalled Chief Felipe Osaba stating he should just put in for retirement since, as Chief Osaba put it, "If you go anywhere else, it's going to happen again. *You're going to be the person creating the problems." Id*. Lieutenant Lattimore acknowledged and admitted to hitting Plaintiff Ibanez during her deposition. *Id. at Par. 14*. She explained away her use of derogatory language by saying "[W]e play around a lot" and [W]e say a lot of things that a lot of people probably don't like." *Id*. Lieutenant Lattimore further testified that despite this admission, the Defendant advised her that Mr. Ibanez's complaint was wholly unsubstantiated *Id*.  Further calling into question the veracity of the complaint process, Defendant lost the recordings evidencing both Plaintiff and Mr. Ruiz's complaints *while the investigation was ongoing*. [*Id. at Par. 61-62.*

In addition to his history of prior complaints being disregarded, and the statements prepared by Mr. Ibanez and Fire fighter Bryan Ruiz going "missing" in 2017, the open and obvious nature of Lieutenant Lindauer's conduct also creates concern as to the effectiveness of the complaining procedures. As Mr. Ibanez testified, "she made that comment [referring to 'this

nigger smells like shit"] several times, but she was saying it in front of people who were poppy boys" and "[S]he would freely say that among other firefighters." *Id. at Par 18*. Her hostility was unchecked and unabashed. Chief Boline himself even seemed to write up Mr. Ibanez's complaints before they even were investigated. During his deposition, Chief Boline was asked if he spoke to Lieutenant Lindauer after Mr. Ibanez filed his February 2020 internal complaint. Without knowledge of the investigation, the underlying facts, or witnesses, Chief Boline stated, "I know this is important to Tony, but this wasn't big on my important list because, *you know, I don't entertain lies*." [*Ex. C, Boline Part 1, at 99:9-18*].

Ultimately, Plaintiff began to escalate his complaints as to Lieutenant Lindauer's unlawful conduct and, as a byproduct, was subjected to routine meetings and "interventions" all of which seemed superficial as opposed to productive. Plaintiff complained verbally to Lieutenant Menendez regarding Lieutenant Lindauer's use of the word "nigger" and her "jokes" about black people but despite his complaints, she continued to use the word "nigger." [D.E. 37, Par. 21]. As stated repeatedly throughout his deposition, Chief Boline failed to intervene and prevent the escalation of harassment by Lieutenant Lindauer. *Id. at Par. 19*.

Plaintiff made numerous efforts to cause the harassment to end. Only when he gave up his bid and was finally removed from the supervision of Ms. Lindauer did he no longer feel subjected to her racially charged conduct. Defendant failed to protect Plaintiff from the ongoing hostile work environment and are liable as a result.

C. **Defendant MDC is Liable for Violating Plaintiff's Rights Pursuant to the Rehabilitation Act**

Defendant MDC subjected Plaintiff to unlawful adverse employment action in violation of the Rehabilitation Act. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921, 926 (11th Cir. 2016).

In establishing his claim for discrimination pursuant to the Rehabilitation Act, it is incumbent upon the Plaintiff to establish that her "(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability." *J.A.M.*, 646 F. App'x at 926. This can be established through evidence supporting the contention that he was "discriminated against by way of the defendant's failure to provide a reasonable accommodation." *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010).

As to element one, Plaintiff contends he suffered from three disabilities: (1) post traumatic stress disorder, (2) high blood pressure, and (3) his brain injury resulting from his fall in April 2020. [D.E. 37, Par. 75].

On April 27, 2020, while working at Station 26, Plaintiff was placed on restrictive duty because of a head injury he suffered while completing a hose deployment drill. *Id. at Par 37-42*. As Plaintiff described in his deposition and corroborated by his contemporaneous medical records, Plaintiff Ibanez briefly lost consciousness impacting his ability to recall what lead to his fall and subsequent injury. *Id*. Plaintiff Ibanez's recollection is comprised of his own recollection of the drill and of what his fellow fire-fighters stated they observed as he attempted to put together the events surrounding the drill. *Id*.   Plaintiff testified that following his fall, he noticed bruising on his head and swelling. *Id. at Par. 41*. Ultimately, as the day progressed and his symptoms worsened, Plaintiff sought medical treatment, was evaluated within the station, and subsequently sent to the hospital for further evaluation. *Id. at Par. 40*.

Despite his fall and brief loss of consciousness, Lieutenant Lindauer failed to ensure Plaintiff received any form of medical care or evaluation until later that evening. *Id. at Par. 37*. No one even so much as checked his vitals despite the request being suggested by his fellow firefighters who saw his fall. *Id*.

Furthermore, Defendant's failed in their purported efforts to accommodate Plaintiff's disabilities. Beyond the highlighted lack of proper care and treatment above, the record further demonstrates that the Defendant, while initially approved Plaintiff's requests for restricted leave, ultimately began to stand in the way, interfering with his physicians' requests to extend his leave. As a result of his injury in April 2020, Plaintiff requested and admitted was placed on restrictive duty by the department, wherein he was assigned to answer phones in Doral under the supervision of Chief Robin Duan. *Id. at Par. 54-56*. Throughout this period of restrictive leave, Chief Duran was aware and intimately in the loop of Plaintiff's regularly doctor visits as Mr. Ibanez routinely emailed Chief Duran to advise her of each appointment and/or pertinent medical information. *Id*.

As the restrictive duty period came to its close, Plaintiff spoke with Chief Duran about extended the date, providing medical paperwork from his personal physician responsible for treating his head injury. *Id*. Chief Duran not only failed to provide the request, but she in fact also failed to acknowledge the request, ignoring Mr. Ibanez entirely and sending him back out into the field without so much as engaging in the interactive process. *Id*. This request was ultimately ignored not only by Chief Duran but additionally by occupational health. *Id*.

Similarly, during the recovery efforts at the Surfside collapse on June 24, 2021, and after hours of effort on the pile, Plaintiff became ill, throwing up, and was subsequently taken to the hospital. *Id. at Par. 50-53*. Despite requesting restricted duty through Occupational health,

plaintiff's request was denied. *Id.* Instead, Plaintiff went back into the pile and continued recovery efforts the next day. *Id*. Plaintiff was not permitted to see the workman's compensation doctor for approximately a week following this incident. *Id*.

Based on the foregoing, a reasonable jury could conclude that on two separate occasions, Defendant's failed to accommodate Plaintiff, let alone engage in a reasonable discussion regarding his need for an accommodation relating to his disability.

### D. Defendant MDC is Liable for Unlawfully Retaliating Against Plaintiff in violation of Title VII, the Rehabilitation Act, and the Florida Workers' Compensation Law

Defendant MDC subjected Plaintiff to repeated adverse employment actions in retaliation for his (1) his complaints pursuant to Title VII, (2) his request for an accommodation pursuant to the Rehabilitation Act, and (3) in retaliation for his seeking workers' compensation benefits.

As an initial matter, Plaintiff's claims for retaliation pursuant to Title VII, the Rehabilitation Act, and the Florida Workers' Compensation Law can be analyzed under the same McDonnell Douglas burden shifting framework. *See Zainulabeddin v. Univ. of S. Fla. Bd. of Trs.*, No. 17-11888, 2018 WL 4214308, at *5 (11th Cir. Sept. 5, 2018); *Burgos v. Napolitano*, 330 F. App'x 187, 189 (11th Cir. 2009); *Bennet v. Dominguez*, 196 Fed. Appx. 785, 791 (2006); *Gonzales v. Pasco Cty. Bd. of Cty. Comm'rs*, 2013 WL 179948, at *8 (M.D. Fla. Jan. 17, 2013). It should be noted that "[t]his formula must not be applied mechanically, but flexibly, with a view toward the particular [ ] procedures and factual situation presented." *Phillips v. Joint Legislative Comm. on Performance and Expenditure Review of the State of Miss.,* 637 F.2d 1014, 1027 (5th Cir.1981).

First, the plaintiff must establish a *prima facie* case of discrimination. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In articulating a *prima facie* claim for retaliation, Plaintiff

13

must show that: (1) he engaged in protected activity; (2) Defendant took an adverse employment action; and (3) a causal connection links Plaintiff's protected activity with the adverse action. *Village of Tequesta v. Luscavich*, 240 So. 3d 733, 738 (Fla. 4th DCA 2018); *See also Smith v. Miami-Dade County*, 621 Fed. Appx. 955, 960 (11th Cir. 2015); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (The casual connection can be established indirectly, by showing that the protected activity was closely followed in time by the adverse action).

The Courts have held that protected activities include informal protests to the employer, so long as they specifically allege that discrimination has occurred. *LeBlanc v. Hill Sch.*, Civ. Action No. 14-1674, 2015 U.S. Dist. LEXIS 2981, at *35-36 (E.D. Pa. 2015) (finding a protected activity where the claimant complained of sex and age discrimination both in writing and in person). Furthermore, reading the provision requiring that a complainant only engages in protected activity where opposition to the harassment is made to a particular person designated by the employer is unfair. *See E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067-68 (6th Cir. 2015). Therefore, in reviewing plaintiff's retaliation claims, the court held "that a complaint to the harassing supervisor qualifies as protected activity." *Id*.

The third element is construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Carter v. Health Mgmt. Assocs.*, 989 So. 2d 1258, 1263 (Fla. 2nd DCA 2008). A plaintiff's burden to prove causation can be met by showing a close temporal proximity between the statutorily protected activity and adverse-employment action. *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir.2007) (*per curium*). "[T]he timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (*citing Estate of Smith v. Marasco*, 318 F.3d 497,

512 (3d Cir. 2003)). "As part of the causation analysis for a retaliation claim, a court should consider whether the alleged adverse action and the protected activity were close in time." *Higdon v. Jackson*, 393 F.3d 1211, 1220–21 (11th Cir. 2004). "[M]ere temporal proximity between ... knowledge of protected activity and an adverse ... action ... must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). "A period of as much as one month between the protected expression and the adverse action is "not too protracted." *Higdon*, 393 F.3d at 1220. As such, the determination of whether the temporal proximity infers a causal connection is fact sensitive, and the ultimate determination depends on "how proximate the events actually were, and the context in which the issue [arose]." *Farrell v. Planters Lifesavers Co*, 206 F.3d 271, 279 (3d Cir. 2000). Notably, a set of actions, considered in the aggregate, may constitute a materially adverse action, even if some of the actions do not rise to a materially adverse action individually. *See Davis v. Fla. Agency for Health Care Admin.*, 612 F. App'x 983, 985 (11th Cir. 2015). Moreover, to demonstrate a materially adverse action, Plaintiff need only show the action would dissuade a reasonable worker from complaining about discrimination. *Burlington v. N. & S.F. Ry. V. White*, 548 U.S. 53, 68 (2006).

Next, the burden shifts to the employer who must "articulate some legitimate, nondiscriminatory reason for the adverse action." *Williams v. Aramark Campus LLC*, CV 18-5374, 2020 WL 1182564, at *3 (E.D. Pa. Mar. 12, 2020). Finally, the plaintiff must in turn "establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable action." *Id*. In combatting the Defendant's so called legitimate business reason, Plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997).

As an initial matter, Plaintiff took numerous steps which all can be reasonably perceived as protected activity. In addition to his complaints directly to Lieutenant Lindauer, Plaintiff further complained up the ladder try to find resolution. Plaintiff completed and submitted a Human Right & Fair Employment Practices Intake Questionnaire on February 25, 2020, where he flags, among other actions, discriminatory "color" based discrimination by Lieutenant Lindauer. [D.E. 37, Par. 69-71].

Additionally, Plaintiff filed a complaint with Maria Jose via email on two separate occasions and to Chief Holmes. *Id. at Par/ 70-72*. Plaintiff's first complaint to Ms. Jose was made on March 13, 2020, and the second on April 17, 2020. *Id*. Plaintiff also filed a complaint with the Human Rights and Fair Employment Practices Division in February 2020 as well as with the Florida Commission on Human Rights in September 2020. *Id. at Par. 67 and 93*.

Following his complaints, Plaintiff testified that the mistreatment by Lieutenant Lindauer began to escalate. First and foremost, both Lieutenant Lindauer and chief Boline confirmed that Plaintiff was issued a coaching – the first tier of the disciplinary action process. *Id. at Par. 88*. In addition to what he believed was Lieutenant Lindauer "over drilling" her team, she also began to "create lies" about Plaintiff, stating that he was a bad employee and a liar. *Id. at Par. 26*. In providing examples, Plaintiff testified to an incident involving a drowning patient. [*Ex. A, Ibanez, at 99:4-100:15*]. Plaintiff testified that Lieutenant Lindauer, through her own actions, caused the team to arrive late on scene but when asked by the Chief about the event, she proceeded to lie, stating that it was the result of Mr. Ibanez's lack of knowledge, poor conduct, and insubordination. *Id*.

Furthermore, Plaintiff was presented what seemed to be the Defendant's only option in resolving discrimination disputes: move, tell the victim to deal with it or bid out. In 2020, Chief Boline instructed Plaintiff, as it related to Lieutenant Lindauer, that Plaintiff should either suffice with being miserable or bid out. *Id. at Par. 19.* This instruction all but mirrored that which he was instructed in 2017 surrounding his complaints with Lieutenant Lattimore. Plaintiff was instructed by Chief Krumenacker to either "get along with Nicky Lattimore or let my bid go." *Id. at Par. 60.* He further recalled Chief Felipe Osaba stating he should just put in for retirement since, as Chief Osaba put it, "If you go anywhere else, it's going to happen again. *You're going to be the person creating the problems." Id.* In fact, the record demonstrates that even throughout the investigation, it was the victims, Plaintiff and Mr. Ruiz, who were required to move from their unit, not Ms. Latimore. *Id. at Par. 10*.

The Defendant's sole "solution" was not to end the harassment and discrimination but rather to further subject the Plaintiff to adverse action by forcing him to uproot his career and start again at a new house.

Further still, Florida Statute § 440.205 provides: "No employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation ... under the Workers' Compensation Law." It should be noted that requesting a reasonable accommodation into itself is a protected activity under the ADA. *Ponce v. City of Naples*, No. 2:17-CV-137-FTM-99CM, 2017 WL 2692829 (M.D. Fla. June 22, 2017); *Vargas v. Fla. Crystals Corp.,* No. 16-81399-CIV, 2019 WL 8955114 (S.D. Fla. May 13, 2019); *Earl v. Mervyns, Inc.*, 207 F.3d 1361 (11th Cir. 2000).

As he testified during his deposition, Plaintiff Ibanez believes that Chief Duran proceeded to take retaliatory action towards him as a result of his filing a claim for workers compensation. [D.E. 37, Par. 46-59].

As a result of his injury in April 2020, Plaintiff requested and admitted was placed on restrictive duty by the department, wherein he was assigned to answer phones in Doral under the supervision of Chief Robin Duran. *Id*. Throughout this period of restrictive leave, Chief Duran was aware and intimately in the loop of Plaintiff's regularly doctor visits as Mr. Ibanez routinely emailed Chief Duran to advise her of each appointment and/or pertinent medical information. *Id.* In addition to limiting communication via email, Chief Duran participated in and/or assisted in interfering with Plaintiff's requests to remain of light duty following his injury. *Id*.

## **CONCLUSION**

In conclusion and in light of the above enumerated reasons, Plaintiff Tony Ibanez respectfully requests the Court deny Defendant Miami-Dade County's Motion for Summary Judgment and thereby submit this matter to the fact finder for determination.

Dated:   June 29, 2022,
         Miami, FL

DEREK SMITH LAW GROUP, PLLC

_____
Caroline H. Miller, Esq.
701 Brickell Avenue, Suite 1310
Miami, Florida 33131
P: (305) 946-1884
caroline@dereksmithlaw.com
*Attorneys for Plaintiff Loren Bowen*

18

## **CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that I have electronically filed the herein Memorandum in Opposition to Defendants Motion for Summary Judgement with the Clerk of Court via CM/ECF. I further certify that the foregoing memorandum has been served upon the following parties on this day, June 29, 2022:

Geraldine Bonzon-Keenan, Esq.
Leona N. McFarlane, Esq.
Miami-Dade County Attorneys
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Phone: (305) 375-5151
Email: Leona.mcdarlane@miamidade.gov

*Attorneys for Defendants Miami Dade County and Yvette D. Lindauer*

Respectfully submitted,

_____
Caroline H. Miller, Esq.
DEREK SMITH LAW GROUP, PLLC
701 Brickell Avenue, Suite 1310
Miami, Florida 33131
P: (305) 946-1884
Email: caroline@dereksmithlaw.com

*Attorneys for Plaintiff Tony Ibanez*